SHEEHAN et al, Respondents, v. MINNEAPOLIS & ST. L. R. CO., Appellant.

(193 N. W. 597.)

(File No. 5097.   Opinion filed May 14, 1923.)

1.  **Carriers—Negligence—Damages—Presence of Caretaker Not Absolving Live Stock Carrier of Liability for Negligence.**

   The presence of a caretaker relieves the live stock carrier of certain duties in regard to the care of the stock, and shifts to the shipper the burden of showing that the carrier was negligent, but does not relieve carrier from the duty to afford the caretaker reasonable opportunity to feed and water and to otherwise care for the stock, or from liability for negligence if injury resulted therefrom.

2.  **Carriers—Evidence—Negligence—Evidence Held to Show Negligence of Carrier in Transportation of Horses.**

   In shipper's action against railroad for damage to shipment of horses, evidence held to prove that the railroad was negligent in delaying the transportation of the shipment in not making feed available at stations where shipment was delayed, and in not furnishing facilities for unloading the horses within a reasonable time after they reached their destination.

3.  **Carriers—Negligence—Live Stock—Shipments—Live Stock Carrier Required to See that Feed Is Available at Feeding Stations.**

   It is the duty of the shipper of live stock or his agent, if either accompanies the shipment, to see that the stock is prop-

erly fed, but it is the carrier's duty to see that feed is available at feeding stations when needed.

4.  Carriers—Live Stock—Shipments—Railroad Required to Furnish Facilities for Unloading Stock Within Reasonable Time After Arrival at Destination.

It was the duty of a railroad to furnish facilities for unloading horses accepted by railroad for shipment within a reasonable time after they reached their destination, and, if it became necessary to use the yards of another company for that purpose, it was incumbent on the railroad to transfer the cars to such other yards so that the stock could be unloaded.

5.  Carriers—Negligence—Evidence—Extent of Injuries to Horses a Question for Jury.

In an action against a railroad for damage to a shipment of horses, the extent of the injuries was a question for the jury.

6.  Appeal and Error—Railroads—Evidence—Value—Admission of Testimony as to Value of Horses When Delivered to Railroad Other Than Defendant Held Harmless When Condition Was Same When Delivered to Defendant.

In an action against a railroad for damage to a shipment of horses, the admission of testimony as to the value of the horses at point from which they were shipped on other railroad and their value when they arrived at their destination over the defendant's road, held harmless in view of evidence that they were in the same condition when they were turned over to the defendant as when they were originally loaded into the cars of the other railroad.

7.  Witnesses—Evidence—Value—Live Stock—Shipments—Contracts—Contracts Between Shipper and Railroad Stating Value of Horses to Fix Freight Rate and Maximum Liability of Carrier Not Admissible to Impeach Shipper's Testimony as to Value.

In an action against a railroad for damage to shipment of horses, contracts between shipper and other railroad from which the horses had been transferred to the defendant railroad, in which the shipper had declared the horses to be of specified values for the purpose of enabling the other railroad to apply its lawful rates as provided by its tariffs, held not admissible to impeach the shipper's testimony as to the value of the horses, since the amount stated in such contracts did not purport to fix the value of the horses, but merely to limit the liability of the carrier.

8.  Carriers—Evidence—Admissions—Damages—In Action for Damages to Shipment of Horses, Letter Claiming Damages for Injuries to Other Shipment Held Not Admissible.

In an action for damage to shipment of horses, a letter in which plaintiffs claim damages for injuries to a certain shipment of horses was not admissible in the absence of a showing that any of the horses which the letter claimed to have been injured were included among the horses for injuries to which the action was brought.

Appeal from Circuit Court, Codington County; Hon. W. N. Skinner, Judge.

Action by M. Sheehan and D. L. Moore, copartners doing business under the firm name and style of Sheehan & Moore, against the Minneapolis & St. Louis Railroad Company. From judgment for plaintiffs, and from an order denying a new trial, the defendant appeals. Affirmed.

*Case & Case*, of Watertown, and *C. W. Wright* and *M. M. Joyce*, both of Minneapolis, for Appellant.

*Mather & Stover* and *George H. Marquis*, all of Watertown, for Respondents.

(1) To point one of the opinion, Appellant cited: Mix v. Chicago, M. & St. P. Ry. Co. (S. D.), 149 N. W. 727; Webster v. Union Pacific Ry. Co., 200 Fed. 597; Starr v. C. B. & Q. Ry. Co. (Neb.), 127 N. W. 682; Cleve v. C. B. & Q. Ry. Co. (Neb.), 108 N. W. 983; Zimmerman v. Northern Pacific Ry. Co., 167 N. W. 546; Terra Haute and Indianapolis Ry. Co. v. Sherwood, 17 L. R. A. 339; Faust v. Chicago & North Western Ry. Co., 73 N. W. 623; Colsch v. C. M. & St. P. Ry. Co., 34 L. R. A. (N. S.) 1013; Elliot on Railroads, Sec. 1549; Southern R. R. v. Prescott, 240 U. S. 632 (60 L. ed. 836), 10 C. J. 381; Wilke v. Ill. Cent. Ry. Co., 133 N. W. 746.

Respondent cited: McElwin v. Union Pac. R. Co. (Neb.), 163 N. W. 845; Texas & P. Ry. Co. v. McMillen (Texas), 183 S. W. 773; Washington Horse Exchange v. Louisville & N. R. Co. (N. C.), 87 S. E. 941; Nashville C. & L. Ry. Co. v. Johnson (Ind. App.), 106 N. E. 414, 109 N. E. 912; Kelly v. Adams Express Co. (Ky.), 119 S. W. 747; Blair v. Jackson v. Wells, Fargo & Co. (Iowa), 135 N. W. 615; Hunt v. Chicago, B. & Q. R. Co. (Neb.), 146 N. W. 986.

(2) To point two, Appellant cited: Rev. Code 1919, Sec. 1177; Adams Express Co. v. Croninger, 226 U. S. 491 (57 L. ed. 314); Missouri K. & T. Ry. Co. v. Harriman, 227 U. S. 657 (57

L. ed. 690) ; Cincinnati N. O. & T. P. Ry. Co. v. Rankin, 241 U. S. 319 (60 L. ed. 1022) ; Missouri K. & T. Ry. Co. v. Byrne, 100 Fed. 359; Jackson v. C. & N. W. Ry. Co., 147 N. W. 732; Colsch v. C. M. & St. P. Ry. Co., 34 L. R. A. (N. S.) 1013.

Respondent cited: McFall v. Chicago B. & Q. R. Co. (Mo.). 168 S. W. 341; Swinney v. American Express Co. (Iowa), 115 N. W. 212, 4 R. C. L., Sec. 421, p. 960; Walton Land & Timber Co. v. Louisville & N. R. Co. (Fla.), 72 So. 485; Wegner v. Chicago, St. P., M. & O. R. Co. (Neb.), 186 N. W. 971; St. Louis, S. F. R. Co. v. Shepard (Okla.), 139 Pac. 833, 37 S. Ct. 274, 240 U. S. 240, 60 L. ed. 622; Jeffries v. Chicago, B. & Q. Ry. Co. (Neb.), 129 N. W. 273; Kansas City, M. & O. Ry. Co. v. Beckham (Tex. Civ. App.), 152 S. W. 228; Chicago, B. & Q. R. Co. v. Morris (Wyo.), 93 Pac. 664; Missouri, K. & T. Ry. Co. of Texas v. Rich (Tex. Civ. App.), 112 S. W. 114.

(3)   To point three, Appellant cited: St. Louis & Indian R. Company v. Wells, 99 S. W. 534; Adams Express Company v. Braaton, 106 Ill. App. 563; Fluckiger v. Chicago & N. W. Ry. Co., 154 N. W. 865; Webster v. Union Pacific Ry. Co., 200 Fed. 597; R. C. L., Vol. 4, Sec. 462; Indianapolis Ry. Co. v. Sherwood, 17 L. R. A. 339; Foss v. C. & N. W. Ry. Co., 34 L. R. A. 623; Colsch v. C. M. & St. P. Ry. Co., 34 L. R. A. (N. S.) 1013.

Respondent cited: Drake v. Great Northern Ry. Co., 24 S. D. 19, 123 N. W. 82; Smith v. Hines (Idaho), 196 Pac. 1032.

(4)   To point four, Respondent cited: Crozier v. U. S. Railroad Adm. (Iowa), 181 N. W. 695; Byrum v. Chicago & A. R. Co. (Mo. App.) 226 S. W. 91; Boyd v. St. Louis Express Co. (Mo. App.), 211 S. W. 702; Heath v. Sandersville R. Co. (Ga. App.), 98 S. E. 92; Baker v. Bush, (Mo. App.), 194 S. W. 1061; Fesser v. Chicago & I. M. R. Co., 193 Ill. App. 432; 4 R. C. L., Sec. 417, p. 956; Kansas City, M. & O. Ry. Co. of Texas (Tex. Civ. App.) v. Blackstone & Slaughter, 218 S. W. 208.

POLLEY, J.  On the 14th day of July, 1917, plaintiff shipped three carloads, 61 head, of horses—unbroken range horses—from Miles City, Mont., to Watertown, S. D.  From Miles City to Aberdeen they went over the Milwaukee Railroad.  At Marmarth, N. D., the horses were unloaded, fed, watered, and rested.  They were then reloaded, and when they arrived at Aberdeen, S. D.,

they were again unloaded, fed, watered, and rested. They were then reloaded, and the cars containing them were transferred to the defendant company on its tracks at Aberdeen at or prior to 9 o'clock on the morning of July 17. The cars were then allowed to stand on the track in defendant's yards at Aberdeen until 4:30 p. m. of that day, when they were moved to Conde, a distance of 37 miles, where they arrived at 6:30 p. m. of that day. They were then unloaded into defendant's stockyards, where they remained until 8 o'clock and 5 minutes on the following evening, when they were started for Watertown, at which place they arrived at 11 o'clock and 5 minutes on that evening. They were then allowed to remain in the cars on the tracks in defendant's yards until about 9:30 the following morning, when they were unloaded into defendant's stockyards. It is alleged in the complaint that there was unnecessary delay in moving said shipment after it came into defendant's possession, and, because of such delay, lack of care, and the negligent manner in which said horses were handled while in the custody and control of defendant, many of them became cut and bruised about their head, back, and legs, and otherwise so injured as to greatly depreciate their value, and this action is brought to recover the damage resulting therefrom. Verdict and judgment were for plaintiffs, and defendant appeals.

Defendant's answer is merely a general denial, except that it admits the shipment which it alleges was received from the Milwaukee Road in interstate traffic, and alleges that, if the horses were damaged at all, such damage occurred before the horses came into the possession of the defendant. It is a fact, although not alleged in the answer, that plaintiffs sent a man with the horses as caretaker, and that he remained with said horses constantly, so far as possible, from the time they were loaded into the cars at Miles City until they were finally unloaded at Watertown.

[1]    Defendant takes the position in this court that, because the shipment was accompanied by a caretaker, it is not responsible for injury to the stock. But this is not an unqualified rule. The presence of a caretaker relieves the carrier of certain duties in regard to the care of the stock, and shifts the burden of showing negligence on the part of the carrier in certain cases; but the carrier remains liable for its negligence if injury results therefrom. This matter was discussed at some length by this court in

28—Vol. 46, S. D.

Mix v. R. R. Co., 34 S. D. 613, 149 N. W. 727, and cases there cited. In that case this court adopted the rule laid down in Elliott on Railroads, § 1549, to the effect that the presence of a care-taker—

"may relieve the carrier from the duty to feed and water and otherwise give particular attention to the stock, but it will not relieve the carrier from the duty to afford the owner reasonable opportunity for so doing. The fact that the owner accompanies the stock and takes charge of it may also be important from the question of contributory negligence. So, where the owner accompanies the stock under a special contract to care for them himself, he may well be presumed to be as well acquainted with the facts in regard to their loss or injury as the carrier, and, as they may have been injured because of his own negligence, or because of their inherent nature and propensities, and not by any negligence of the carrier, it is but just to require him to show the facts. The rule in such case, therefore, is that the burden of proof is upon the plaintiff to show that a breach of duty on the part of the carrier caused the injury or loss, and, if the carrier is liable only for negligence, the burden is upon the plaintiff to show such negligence."

[2] Applying the above rule to the facts in this case, we have no hesitancy in holding that the carrier was grossly negligent in the manner in which it handled plaintiffs' shipment of horses; that plaintiffs have maintained the burden of proving such negligence, and that the injury, if any, was the result of such negligence.

It will be remembered that these cars of horses were turned over to the defendant at 9:30 in the morning. It was in July; consequently a hot day. The evidence, if evidence were needed, shows that horses crowded into a car on a hot day soon become very much heated; that, if the cars are kept moving, the air circulates through the car among the animals, and keeps down the heat. It also shows that horses are less likely to jump and plunge about in a car while it is moving than when it is standing still. One witness testified that he could feel the heat from the horses while passing along by the side of the cars. The evidence also shows, though evidence is not necessary, that, while the cars were standing still, the horses were being tormented by flies, and that

this would have a tendency to cause them to kick and plunge about, and in that way injure themselves and injure each other.

The evidence shows that the running time for stock cars over defendant's road from Aberdeen to Watertown did not exceed five hours, and that, if ordinary dispatch had been exercised, after the cars were delivered on defendant's track, the horses would have reached Watertown and been unloaded before they left Aberdeen. We do not intimate that defendant should have run a special train or changed its train schedule in order to accommodate this particular shipment; but defendant is charged with knowledge of its own train schedules, and, if it had no train that could move these cars out of Aberdeen prior to 4:30 in the afternoon, it should have notified palintiffs' agent to that effect, and refused to accept the horses until they could have been moved. But, having accepted the horses for shipment, it was bound to exercise a degree of diligence commensurate with the circumstances shown to have then existed to forward them to their destination with reasonable dispatch.

[3]  What is said relative to the delay in leaving Aberdeen applies with even greater force to the delay at Conde. Defendant did not notify palintiffs' agent that there would be a delay at Conde, nor does it claim that any train schedule showed there would be such delay. It does not appear that plaintiffs' agent had any notice whatever until the train reached Conde that he could not go right on through to Watertown that evening; but, having stopped the cars at Conde, it was the defendant's duty to provide feed for the horses while they were there. It is the duty of the shipper to pay for feed that is fed to the stock at feeding stations, and it is the duty of himself or his agent, if either accompanies the shipment, to see that the stock is properly fed; but it is the duty of the carrier to see that feed is available at such stations when needed. This the defendant did not do. When the caretaker learned that he would be obliged to lay over at Conde, he asked defendant's agent for feed. He was told to get out and look for feed, and that the defendant would pay for what was needed, and charge the cost on the freight bill. The caretaker did make an effort to get feed, but all he could find in the town was a small quantity of hay that a drayman was willing to spare him. The exact amount of such hay is not shown, but, from the way it is

described in the testimony, and the fact that it cost only $2.50, there could not have been more than a very few mouthfuls for each animal.

[4] The horses were not unloaded at Watertown for some 9 or 10 hours after their arrival. Plaintiffs contend that this constitutes negligence on the part of defendant, and was largely accountable for the injured condition of the horses when they were unloaded. The reason given by defendant why the horses were not unloaded at an earlier hour is that in the train that brought the horses to Watertown were two carloads of cattle that had been in the cars so long that under the Twenty-Eight Hour Law (U. S. Comp. St., §§ 8651-8654) defendant was obliged to unload and feed and rest said cattle on their arrival at Watertown. The defendant's stockyards in Watertown were not large enough to accommodate both the cattle and the horses; therefore the horses could not be unloaded until the cattle had been rested and reshipped. True, defendant says that it offered the caretaker the privilege of unloading the horses and driving them over to the stockyards of the Chicago & Northwestern Railroad Company, a distance of only a block or such a matter from defendant's stockyards. The caretaker appears to have been an experienced horseman, and the impossibility of one or two men moving 61 head of range horses from one stockyards to the other was so apparent that he gave the suggestion no consideration whatever; and we might say the absurdity of the proposition is so glaring that we hardly think it was made in good faith. It was the duty of the defendant to furnish facilities for unloading the horses within a reasonable time after reaching their destination, and, if it became necessary to use the yards of another company for that purpose, it was incumbent upon the defendant to transfer the cars to such other yards, so that the stock could be unloaded. We hold that the company was negligent, under the circumstances shown by this record, in not affording facilities for unloading plaintiffs' horses within a reasonable time after they reached Watertown.

[5] Defendant contends that the evidence of injury to the horses is not sufficient to support the verdict. The undisputed evidence shows that, when the horses were turned over to defendant at Aberdeen, they were, with the exception of one, that had been injured at Mobridge, in good condition; that, when they

were unloaded at Watertown they had various cuts and bruises that injured them to a greater or lesser extent. This condition of the horses was so apparent when they were unloaded that defendant's agent at Watertown, immediately upon seeing them, and before any complaint had been made or claim for damages had been filed, reported the case to defendant's claim department at St. Paul. That department immediately sent a man to examine and report upon the condition of the horses. Upon the receipt of this report a veterinary surgeon was sent from St. Paul to make an examination of the horses and the extent of their injuries. That the horses were injured to some extent is not disputed. This made the extent of the injuries purely a question for the jury.

It is contended by defendant that the verdict is so excessive under the evidence as to indicate prejudice on the part of the jury. We cannot agree with this contention. The testimony, if believed by the jury, warrants the verdict. There were other elements of damage than the physical injury to the horses. The horses were shipped to Watertown to be sold, but, when they were unloaded, their condition was found to be such that they were unfit for sale or to be offered for sale, and, so soon as they had sufficiently recuperated to stand the trip, they were shipped back to Ft. Pierre, from which place they had formerly been shipped to Miles City.

[6]   In order to show the extent of the damage to the horses, plaintiff was permitted, over proper objection by defendant, to show the value of the horses as they were when they left Miles City, and their value as they were when they were unloaded at Watertown. Defendant contends that this was error. There might be much more force in this contention were it not for the fact that the evidence shows that the horses were in the same condition when they were turned over to defendant at Aberdeen as when they were loaded into the cars at Miles City. Defendant offered no evidence to show that the horses were not in the same condition when received by it at Aberdeen as when they left Miles City, nor that there was any difference in their value; therefore no harm was occasioned to defendant, even though technical error may have been committed.

[7]   When the horses were shipped from Watertown to Ft. Pierre they were shipped over the Chicago & Northwestern Rail-

road Company. For the purpose of making this shipment, separate contracts, designated in defendant's brief as E, F, and G, were signed by plaintiff for each car, and each of said contracts contained the followng paragraph:

"For the purpose of enabling the Chicago & Northwestern Railriad Company to apply its lawful rates as provided by its tariffs, the shipper declares the said animals to be of the value as follows, to-wit: Each horse, pony, gelding, mare or stallion, $150."

For the purpose of impeaching plaintiffs' testimony as to the value of the horses, defendant offered these contracts in evidence. They were excluded by the court, and this ruling is assigned as error. These contracts were properly excluded. The above clause was not inserted in the said contracts for the purpose of fixing the value of the horses, nor does it constitute a declaration or representation that the horses were of the value stated. As appears from the face of the contracts themselves, the said valuation was inserted for the purpose of fixing the freight rate and the maximum amount recoverable by the shipper in case of the loss of the horses. The amount stated in the contract is intended merely to limit the liability of the carrier, but does not purport to fix the value of the animals.

Numerous exceptions were taken to certain instructions given by the court, and to the refusal to give other instructions requested by the defendant. Careful examination of the instructions given, as well as the requested instructions that were refused, fails to disclose any error in this respect, with the possible exception of that portion of instruction No. 8, relating to the Twenty-Eight Hour Law. The Twenty-Eight Hour Law was in no manner involved in the case, and no reference to it was necessary. On the other hand, we fail to see how such reference prejudiced the rights of the defendant or in any manner affected the verdict. We believe the charge as a whole, as given by the court, fairly presented all the material issues in the case.

[8] During the trial defendant offered in evidence the deposition of one George C. Stiles, to which deposition was attached a letter purporting to have been written by said Stiles at the request of the plaintiffs, making claim for damages caused by injuries to

a certain shipment of five carloads of horses shipped from Ft. Pierre, S. D., to Miles City, Mont., on the 5th day of July. The offer was denied, and rightly so. The injuries that are the basis of this action were all caused or claimed to have been caused after the horses came into the possession of defendant at Aberdeen. It is alleged in the complaint, and there was evidence to prove, that the horses were in sound condition when they were delivered to defendant. No evidence was offered by defendant to disprove this fact. It is true that the 61 head of horses that are involved in this case were all included in the five carloads that were shipped from Ft. Pierre to Miles City, Mont., but there is nothing in the offer made by defendant to show that any of the horses that were claimed to have been injured in the shipment from Ft. Pierre were included in the 61 head involved in this case; therefore, the purported claim for damages set out in said deposition is not material nor remotely pertinent to any of the issues in this action.

We have examined defendant's other assignments, but find nothing that merits special consideration.

The judgment and order appealed from are affirmed.

Note—Reported in 193 N. W. 597. See, Headnote (1), American Key-Numbered Digest, Carriers, Key-No. 208, 10 C. J. Sec. 106; (2) Carriers, Key-No. 228(5), 10 C. J. Sec. 600; (3) Carriers, Key-No. 211, 10 C. J. Sec. 105, 4 R. C. L. 979; (4) Carriers, Key-No. 210, 10 C. J. Sec. 121; (5) Carriers, Key-No. 230(1), 10 C. J. Sec. 601; (6) Appeal and error, Key-No. 1050(1), 4 C. J. Sec. 2952; (7) Witnesses, Key-No. 379(4), 40 Cyc. 2742; (8) Carriers, Key-No. 226(3), 10 C. J. Sec. 591.

The duty of carrier to caretaker accompanying shipment of live stock is discussed in note in 31 L. R. A. (N. S.) 632.

As to statutory duty of carriers of live stock with reference to care of stock during transportation, see note in 44 L. R. A. 449.